IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

| | | |
|---|---|---|
| SHEILA SHERRER, Personal Representative of the Estate of HERSHEL DILLARD, and SHEILA SHERRER, on behalf of the wrongful death beneficiaries of HERSHEL DILLARD | § § § § § § § § § § § § | PLAINTIFF |
| v. | | CAUSE NO. 1:11CV296 LG-RHW |
| COVENANT HEALTH & REHAB OF PICAYUNE, LLC | | DEFENDANT |

## MEMORANDUM OPINION AND ORDER GRANTING MOTION TO ENFORCE ARBITRATION AGREEMENT AND DISMISSING CASE

BEFORE THE COURT is the Motion to Enforce Arbitration [8], and to Stay [6] or Dismiss [7] during arbitration proceedings, filed by Defendant Covenant Health & Rehab of Picayune, LLC. Plaintiff Sheila Sherrer has responded to the Motions, and Covenant has replied. After due consideration of the parties' arguments and the relevant law, it is the Court's opinion that the arbitration agreement should be enforced and this case dismissed.

FACTS AND PROCEDURAL HISTORY

Sixty-seven-year-old Hershel Dillard entered Highland Community Hospital in Picayune, Mississippi on May 10, 2009, with a principal diagnosis of "unspecified septicemia." He had sixteen secondary diagnoses, including sepsis, rheumatoid arthritis, hyperpotassemia, and altered mental status. His long-time physician, Walter Gipson, was his attending physician.

After Dillard had been at Highland Community Hospital for ten days, he was

transferred to Covenant's facility on May 20 for "strengthening and further control of diabetes."  (Pl. Resp. Ex. A 3, ECF No. 9-1).  According to the Hospital's Transfer Summary, "[h]is family finally had convinced patient to go [sic] to agree to go to Rehab. . . . Patient understands the benefits."  (*Id.*)  He had ten diagnoses at the time of the transfer: altered mental status, failure to thrive, dehydration, sacral decubitus, sepsis, scrotal edema, anemia, coronary artery disease, rheumatoid arthritis, and type II diabetes uncontrolled.  (*Id.*)

The Plaintiff states she executed Covenant's admission documents[1] on Dillard's behalf on May 20, while he was still in the Hospital.  The documents included a separate Alternative Dispute Resolution Agreement.  She states that Dillard signed a separate Alternative Dispute Resolution Agreement upon his arrival at the facility later that same day.  (Def. Mot.  Ex. A, ECF No. 8-1).  Following admittance, Dillard was subjected to a complete systems review by a Licensed Practical Nurse.  (Def. Reply Ex. C, ECF No. 12-3).  Dillard responded when called by name, was able to make himself understood and able to express his needs.  He was completely oriented, in that he responded to questions, told the LPN his name, the current season and that he was in a nursing home.  He reported being in constant pain.  An RN noted Dillard was alert and not confused, comatose or lethargic.  He was receiving Lortab 7.5/325 by mouth every four hours as required for pain.  (*Id.*)

---

[1] Plaintiff attached only a blank, unsigned copy of the Admission Agreement. (Pl. Resp. Ex. D, ECF No. 9-4).

Approximately one week later, on May 28, Dr. Gipson completed a PAS (Pre-Admission Screening) Summary and Physician Certification form, in which he stated Dillard could fully communicate, had the ability to understand others, and heard and saw adequately. (Def. Reply Ex. B, ECF No. 12-2). Dillard correctly answered all eleven orientation questions. (*Id*. at 1). He was not diagnosed with Alzheimer's, dementia, mental retardation, and had no history or current evidence of cognitive problems requiring further testing. (*Id*. at 2). Dillard did require considerable assistance with all physical activity, such as bathing, eating, toileting, dressing, meal preparation, and mobility. (*Id*. at 1).

Plaintiff alleges that the staff at Covenant failed to monitor Dillard's glucose levels and as a result, he became hypoglycemic for a prolonged period of time and fell into an irreversible coma. He died on June 27, 2009. Plaintiff filed this lawsuit bringing claims against Covenant for negligence resulting in Dillard's wrongful death.

Covenant seeks to enforce the Alternative Dispute Resolution Agreement signed by Dillard and the Plaintiff. Plaintiff argues the arbitration agreement signed by Dillard is unenforceable for three reasons: 1) Dillard lacked the requisite mental capacity to sign it; 2) the designated arbitrator did not exist at the time the arbitration agreement was executed, making the contract illusory; and 3) there was a lack of consideration. Plaintiff also argues that the arbitration agreement she signed is unenforceable because she lacked the legal capacity to enter into the agreement on Dillard's behalf, and Dillard was not a third-party beneficiary of the

agreement.

The Court conducted a hearing on February 28, 2012, to inquire into the issue of Dillard's competency. Both Sheila Sherrer and Keri Ladner testified, but neither provided any information beyond the material they had previously submitted. Because there was no testimony from Dillard's attending physician, which the Court believed would be crucial to its decision, the parties were allowed time to depose Dr. Gipson and submit additional briefing based on his testimony. The Plaintiff has now provided the deposition testimony of Dr. Gipson.

## DISCUSSION

A two-step inquiry governs whether parties should be compelled to arbitrate a dispute. First, the court must determine whether the parties agreed to arbitrate the dispute. Once the court finds that the parties agreed to arbitrate, it must consider whether any federal statute or policy renders the claims non-arbitrable. *Banc One Acceptance Corp. v. Hill*, 367 F.3d 426, 429 (5th Cir. 2004) (citation and quotation marks omitted). In conducting this two-step inquiry, courts must not consider the merits of the underlying action. *Id.* (citation omitted)

The first step of the process entails determining "whether there is a valid agreement to arbitrate between the parties; and ... whether the dispute in question falls within the scope of that arbitration agreement." *Id.* (citation and quotation marks omitted). These questions are decided according to state law. *Id.* While there is a strong federal policy favoring arbitration, the policy does not apply to the initial determination whether there is a valid agreement to arbitrate. *Id.* (citation

and quotation marks omitted).

An important initial consideration in this case is the *Prima Paint* rule, which requires the Court to distinguish between defenses to the arbitration agreement going to the arbitration provision itself, and defenses to the arbitration agreement going to the entire contract. *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403-04 (1967). "A federal court may consider only issues relating to the making and performance of the agreement to arbitrate." *Id.* "Accordingly, unless a defense relates specifically to the arbitration agreement, it must be submitted to the arbitrator as part of the underlying dispute." *Primerica Life Ins. Co. v. Brown*, 304 F.3d 469, 472 (5th Cir. 2002).

In this case, the arbitration "provision" or "agreement" is the Alternative Dispute Resolution Agreement. The Alternative Dispute Resolution Agreement is a separate, stand-alone document. It is not incorporated into the admission agreement establishing the terms of Dillard's stay at Covenant, nor is there an arbitration provision within the admission agreement. (*See* Pl. Resp. Ex. D, ECF No. 9-4). Plaintiff has called the making of the Alternative Dispute Resolution Agreement signed by Dillard into question; thus her defenses necessarily relate specifically to the arbitration agreement. Accordingly, the initial determination of whether there is a valid agreement to arbitrate, at least in regard to the document signed by Dillard, may properly be considered by the Court rather than submitted to the arbitrator. *See Wash. Mut. Fin. Grp., LLC v. Bailey*, 364 F.3d 260, 266 n. 4

(5th Cir. 2004).

<u>Dillard's Mental Capacity</u>:

Sherrer argues that the medical records show Dillard was unable to physically care for himself, suffered from "altered mental status" and other infirmities, and was noted to be a very poor historian. Sherrer has also submitted her own affidavit, in which she states that she was with her father during the relevant time periods (although not at the time Dillard signed the Agreement) and in her opinion, he "could not and did not understand, appreciate, or comprehend any documents that he may have signed." (Pl. Resp. Ex. C 2, ECF No. 9-3). She states that from May 19 to the 21st,

> He did not acknowledge the presence of his family and others; he could not and did not communicate with others, including me, except for an occasional "Yes" or "No" which often times was not an appropriate response; and he could not and did not engage in conversations with others including his immediate family.

(*Id*. at 1-2).

However, the medical records maintained by Dillard's caregivers paint a very different picture. According to the medical records, Dillard was a man suffering from a number of serious health issues, but whose mental facilities were intact. The admitting nurses and Dillard's treating physician found him to be alert and oriented on May 20, 2009 - the day he signed the Alternative Dispute Resolution Agreement. The Agreement was explained to him by Nicole Morales, the Business Office Manager, who "provided him with the opportunity to ask any questions he may have had regarding the agreement to either me or Keri Ladner, and he then

signed the Alternative Dispute Resolution Agreement in my presence." (Def. Reply Ex. H 2 (¶ 4), ECF No. 12-8). Keri Ladner, the Administrator, was present to witness Dillard's execution of the Agreement. (Def. Mot. Ex. B 2 (¶ 8), ECF No. 8-2). Ladner explained it was her practice to try to answer any questions Nicole Morales could not. (*Id.* at 2). It was also her practice to sign the Alternative Dispute Resolution Agreement only if she saw the resident sign on the resident's signature line of the Agreement. (*Id*). Her signature on the document indicates that she observed Dillard sign the Alternative Dispute Resolution Agreement. (*Id*). Neither of these Covenant employees makes a statement about Dillard's mental state or competency at the time he signed the Agreement.

Dr. Gipson testified that he recalled encouraging Dillard to go to rehab, rather than home, to address his increased weakness and inability to take care of himself. (Gipson Dep. 39:22 - 40:3, ECF No. 22-1). He recalled "it took quite a bit of encouragement from his family for him to decide to go." (*Id.* at 40:1-3; 74:8-16). When asked if he believed Dillard was competent to understand and execute a legal document, Gipson stated "Based on the exam and medical condition of Mr. Hershel, I would have reason to doubt he would be able to make a competent decision over a medical document – over a legal document." (*Id.* at 60:5-8). However, Gipson believed that Dillard *was* able to understand why he was going to rehab and agree to the transfer. (*Id.* at 82:11-22). Gipson further testified that the nurses note – that Dillard was awake, alert, and oriented on May 21, 2009 at 1 p.m. – was

consistent with what he saw in Dillard during the ten days prior to May 21. (*Id.* at

62-64). Gipson further testified that he "had concerns" about whether Dillard was

competent to understand the ADR Agreement. (*Id.* at 103-04). He elaborated:

> [C]ould somebody sit down and explain it in a way that he understood,
> again, they possibly could. But not being there, I can't attest to
> whether that did happen or didn't happen. But if you ask me if you
> handed him this document and asked him to read it would he
> understand it, I would have medical questions of judgment about
> whether he would be able to do that.

(*Id.* at 105:15-23).

Mississippi "law presumes a person sane and mentally capable to enter into a

contract." *Frierson v. Delta Outdoor, Inc.*, 794 So. 2d 220, 224 (Miss. 2001)

(citations omitted). The burden is upon the party seeking to avoid an instrument on

the ground of incapacity, but the burden of proof has been stated as either "a

preponderance of proof," *id.*; *see also Riley v. F.A. Richard & Assoc., Inc.*, 16 So. 3d

708, 717 (Miss. Ct. App. 2009), or by clear and convincing evidence. *Whitworth v.

Kines*, 604 So. 2d 225, 229 (Miss. 1992). The preponderance of the proof standard

has been applied in cases involving a variety of contractual instruments, such as a

property settlement agreement, *Parks v. Parks*, 914 So. 2d 337, 341 (Miss. Ct. App.

2005), a lease agreement, *Frierson*, 794 So. 2d at 224, and a medical authorization.

*Riley*, 16 So. 3d at 717. Although the higher clear and convincing standard seems to

be used primarily in cases involving wills and deeds, *see, e.g., In re Conservatorship

of Cook*, 937 So. 2d 467, 470 (Miss. Ct. App. 2006); *Smith v. Smith*, 574 So. 2d 644,

652 (Miss. 1990), it was also utilized in a case concerned with the mental capacity of

a party to a land financing contract. *Hudson v. Vandiver*, 810 So. 2d 617, 620 (Miss. Ct. App. 2002).

After reviewing these cases, it appears that the Alternative Dispute Resolution Agreement signed by Dillard is more in the nature of the contracts at issue in *Parks*, *Frierson*, and *Riley* rather than a deed or will. There is no transfer of the decedent's property to be concerned with here, as there was in *Cook* and *Smith*. Accordingly, the Plaintiff should have the burden of proving Dillard's incompetency by a preponderance of the evidence in order to invalidate the Alternative Dispute Resolution Agreement.

The evidence to meet this burden must show more than "a general mental weakness or condition," or the ingestion of a narcotic or other drug that might affect his mind. *In re Conservatorship of Moran*, 821 So. 2d 903, 906 (Miss. Ct. App. 2002); *Richardson v. Langley*, 426 So. 2d 780, 784 (Miss. 1983). The test is "Is his mind so unsound, or is he so weak in mind, or so imbecile, no matter from what cause, that he cannot manage the ordinary affairs of life?" *Shippers Exp. v. Chapman*, 364 So. 2d 1097, 1100 (Miss. 1978).

The Mississippi Supreme Court does not require trial courts to make an adjudication of incompetency when deciding whether a party is competent for purposes of executing documents. *See Rockwell v. Preferred Risk Mut. Ins. Co.*, 710 So. 2d 388, 390-91 (Miss. 1998). Accordingly, the statutory requirements for obtaining an adjudication of incompetency, such as those set out in Miss. Code § 93-

13-255, are inapplicable. "Instead, trial courts must allow the party to present alternative evidence to prove that he lacked the requisite understanding for handling his legal affairs." *Rockwell*, 710 So. 2d at 391.

After reviewing all of the evidence in this case, the Court finds that the Plaintiff has failed to show that Dillard was incompetent to manage his legal affairs at the time he signed the ADR Agreement. Although it may be a close question, the preponderance of the evidence is that Dillard's mental facilities were not so degraded by his age and illness to render him incompetent. Dr. Gipson was equivocal about the question of actual incompetency, and the remainder of the medical evidence shows Dillard to have been alert and oriented. Sherrod's affidavit stands alone in supporting her assertion that Dillard was incompetent, and she was not present at the time he signed the Agreement.

As Plaintiff has failed to prove incompetency by a preponderance of the evidence, she plainly also fails to show clear and convincing evidence of incompetency. Accordingly, the Court finds Dillard was competent to sign the ADR Agreement.

The Designated Arbitrator:

Plaintiff next argues that the arbitration agreement is unenforceable because it is undisputed the first designated mediator/arbitrator, ADR Associates, LLC, was not in existence at the time the arbitration agreement was executed, and the rules referenced were not available. Therefore, there could have been no meeting of the minds on the arbitrator or the rules. The Arbitration Agreement provides, in part,

as follows:

> b. **Mediation and Arbitration**. In the event that any Dispute is not resolved through the Grievance Resolution meeting, the Parties agree to participate in formal Mediation and Arbitration to be conducted by ADR Associates, LLC, through its Dispute Resolution Process for Consumer Healthcare Disputes ("ADR Associates' Rules"), which are incorporated herein by reference, and as more fully set forth below. If ADR Associates, LLC is unable or unwilling to conduct the ADR process at the time of the dispute, the parties shall mutually agree upon an alternative organization that is regularly engaged in providing ADR services to conduct the Mediation and Arbitration. If the parties cannot agree on a mediator/arbitrator, each Party shall select one mediator/arbitrator and they together shall choose a third mediator/arbitrator who shall conduct the ADR process.

Plaintiff argues that the Court would be required to "in essence modify the parties' agreement to facilitate arbitration of this dispute" if they were required to arbitrate. (Pl. Resp. 8).

There is Mississippi authority for the general proposition that the unavailability of the designated arbitration forum renders an arbitration agreement unenforceable. *See, e.g., Covenant Health & Rehab. of Picayune, LP v. Moulds*, 14 So. 3d 695, 706-09 (Miss. 2009). However, there are significant differences in the language of the various forum selection clauses that lead to a different outcome in this case.

In *Moulds*, the forum selection clause read:

> The Resident and Responsible Party agree that any and all claims, disputes and/or controversies between them and the Facility or its Owners, officers, directors or employees shall be resolved by binding arbitration administered by the American Arbitration Association and its rules and procedures.

*Id*. at 706. While the Resident was in the Facility, the American Arbitration

Association discontinued administrating cases involving individual patients unless the parties had agreed, after the dispute arose, to arbitrate the dispute.  The Mississippi Supreme Court found it would have to redraft the arbitration agreement if the Resident's estate was required to arbitrate, because "the agreement called on the AAA to administer disputes . . [any other selected arbitrator] would still be bound to apply AAA rules, which would require [the estate] to agree, post-dispute, to be bound to arbitrate, which [the estate] has expressly disavowed [ ] interest in doing." *Id*. at 708.  Other Mississippi cases have invalidated arbitration agreements for the same reason. *See Bedford Health Prop., LLC v. Davis*, 50 So. 3d 362, 365-66 (Miss. Ct. App. 2010); *GGNSC Tylertown, LLC v. Dillon*, No. 2010-CA-01241-COA, 2011 WL 3065415, at *3 (Miss. Ct. App. July 26, 2011) (arbitration agreement provided for dispute resolution exclusively by a forum that subsequently refused individual patient disputes).

There is no indication in this record that ADR Associates had a rule similar to the AAA requiring a post-dispute arbitration agreement.  Further, unlike the cases previously cited, the forum selection clause in this case anticipated that the first-designated ADR organization might not be available and prescribed a method for selecting an alternate organization.  In that event, a reasonable reading of the clause is that the alternate organization would conduct the arbitration pursuant to its own rules.  Accordingly,  the Court finds the language of this provision can be enforced as written.

Consideration:

The Plaintiff contends the arbitration agreement is not supported by any consideration, making it invalid and unenforceable. Plaintiff argues there were no mutual promises in this case to support the agreement. Covenant argues that it gave up the right to resolve any dispute with Dillard in the courts, which constitutes consideration. "[I]n any contract, '[a]ll that is needed to constitute a valid consideration to support an agreement or contract is that there must be either a benefit to the promissor or a detriment to the promisee. If either of these requirements exist, there is a sufficient consideration.'" *Covenant Health & Rehab. of Picayune, LP v. Estate of Moulds ex rel. Braddock*, 14 So. 3d 736, 741, (Miss. Ct. App. 2008), *rev'd on other grounds*, 14 So. 3d 695 (Miss. 2009). Applying this standard, the Alternative Dispute Resolution Agreement was clearly supported by consideration.

Dismiss or Stay Pending Arbitration:

Covenant has requested that the Court either dismiss this case or impose a stay pending arbitration. Neither party has addressed the issue in their briefing. The FAA provides:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

9 U.S.C. § 3.

The plain language of the FAA seems to require that the Court stay this case pending arbitration since Covenant has requested a stay in the alternative. However, the Fifth Circuit has held that the FAA does not prevent a district court from dismissing a case with prejudice when all of a plaintiff's claims are arbitrable. *Alford v. Dean Witter Reynolds, Inc.*, 975 F.2d 1161 (5th Cir. 1992). In *Alford*, the Fifth Circuit concluded that "[t]he weight of authority clearly supports dismissal of the case when all of the issues raised in the district court must be submitted to arbitration." *Id.* at 1164 (citations omitted). *Alford* did not make it mandatory that a district court dismiss a case when all of a plaintiff's claims are arbitrable. *See Apache Bohai Corp., LDC v. Texaco China, B.V.*, 330 F.3d 307, 311 fn. 9 (5th Cir. 2003). Instead, a district court has discretion to stay or dismiss such a case. *Id.* Here, all of Plaintiff's claims are subject to binding arbitration pursuant to the ADR Agreement. There are no claims that are not arbitrable. The Court will therefore exercise its discretion to dismiss, rather than stay, this case.

**IT IS THEREFORE ORDERED AND ADJUDGED** that the Motion to Enforce Arbitration [8], filed by Defendant Covenant Health & Rehab of Picayune, LLC, is **GRANTED**. The Plaintiff is hereby ordered to submit her claims against the Defendant to arbitration.

**IT IS FURTHER ORDERED AND ADJUDGED** that the Motion to Stay [6] during arbitration proceedings, filed by Defendant Covenant Health & Rehab of Picayune, LLC is **DENIED**.

**IT IS FURTHER ORDERED AND ADJUDGED** that the Motion to Dismiss [7] filed by Defendant Covenant Health & Rehab of Picayune, LLC is **GRANTED**. Plaintiff's claims are **DISMISSED**.

**SO ORDERED AND ADJUDGED** this the 29th day of March, 2012.

s/ *Louis Guirola, Jr.*
LOUIS GUIROLA, JR.
CHIEF U.S. DISTRICT JUDGE